IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAWWAD HASAN,<br><br>             Plaintiff,<br><br>    v.<br><br>C/O JOHNSON,<br><br>             Defendants. | 1:08-cv-00381 GSA PC<br><br>ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(ECF Nos. 54, 57) |

Plaintiff is a state prisoner proceeding pro se in this civil rights action. The parties have consented to magistrate judge jurisdiction pursuant too 28 U.S.C. § 636(c)(1).[1] Pending before the Court is Defendant's Amended motion for summary judgment. Plaintiff has opposed the motion.[2]

**I.    Allegations**

This action proceeds on the original complaint. Plaintiff, an inmate in the custody of the

---

[1] Plaintiff filed his consent to magistrate judge jurisdiction on April 9, 2008 (ECF No. 7). Defendant filed his consent on April 12, 2011 (ECF No. 26).

[2] On December 13, 2010, the Court issued and sent to Plaintiff the summary judgment notice required by Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). (ECF No. 22). The order was re-served on Plaintiff on July 20, 2012, in response to the Ninth Circuit's decision in Woods v. Carey, 684 F.3d 934 (9th Cir. 2012) (ECF No. 65).

California Department of Corrections and Rehabilitation (CDCR) at Ironwood State Prison, brings this civil rights action against Defendant Correctional Officer (C/O) B. Johnson, an employee of the CDCR at Corcoran State Prison. The events at issue in this lawsuit occurred while Plaintiff was housed at Corcoran. Plaintiff claims that he was subjected to excessive force such that it violated the Eighth Amendment's prohibition on cruel and unusual punishment.

Plaintiff alleges that on March 22, 2006, he was escorted to Administrative Segregation (AdSeg). Plaintiff was being placed in AdSeg pending a disciplinary hearing against him for threatening staff. Plaintiff alleges that was placed in handcuffs and escorted by Defendant Johnson and C/O Gonzalez. Defendant Johnson, holding Plaintiff by the handcuffs, "without just cause, justification, provocation or good cause or reason, violently jerked the handcuffs, twisted them by the left side of the handcuffs, and thrust plaintiff's handcuffs upward thereby forcing plaintiff to walk on his toes." (Compl. ¶ 13.) Upon reaching the rotunda area, Defendant Johnson "grabbed plaintiff and violently propelled him across the rotunda slamming plaintiff into another wall, and continued to slam plaintiff into walls thereon opposite sides of the rotunda back and forth for several minutes. Plaintiff's head was slammed into the walls several times during this beating episode carried out by defendant Johnson." (Compl. ¶ 14.)

## II.    Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

2

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which

the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

**III.** **Excessive Force**

The Eighth Amendment prohibits those who operate our prisons from using "excessive physical force against inmates." Farmer v. Brennan, 511 U.S. 825 (1994); Hoptowit v. Ray, 682 F.2d 1237, 1246, 1250 (9th Cir.1982) (prison officials have "a duty to take reasonable steps to protect inmates from physical abuse"); see also Vaughan v. Ricketts, 859 F.2d 736, 741 (9th Cir.1988), cert. denied, 490 U.S. 1012 (1989) "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Farmer, 511 U.S. at 834.

Whenever prison officials are accused of using excessive physical force in violation of the Eighth Amendment prohibition against cruel and unusual punishment, the core judicial inquiry is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v.McMillian, 503 U.S. 1, 6-7 (1992) Force does not amount to a constitutional violation if it is applied in a good faith effort to restore discipline and order and not "maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21 (1986); Clement v. Gomez, 298 F.3d 898, 903 (9th Cir. 2002). Under the Eighth Amendment, the court looks for malicious and sadistic force, not merely objectively unreasonable force. Clement v. Gomez, 298 F.3d at 903.

In determining whether the constitutional line has been crossed, the Court may consider such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, the threat reasonably perceived by

4

1  the responsible officials and any efforts made to temper the severity of a forceful response.

2  <u>Hudson</u>, 503 U.S. at 7.  Prison administrators should be accorded wide-ranging deference in the

3  adoption and execution of policies and practices that in their judgment are needed to preserve

4  internal order and discipline and to maintain institutional security.  <u>Whitley</u>, 475 U.S. at 322.

5       In order to meet his burden on summary judgment, Defendant must come forward with

6  evidence that he did not use force on Plaintiff in a manner that was sadistic, malicious, or for the

7  purpose of causing harm.  Defendant must come forward with evidence that any force used on

8  Plaintiff was used in a good faith effort to restore order or maintain discipline.  Defendant

9  supports his motion with his own declaration, the declaration of K. Koehler, LVN, the

10  declaration of C. Marquez, R.N.; the declaration of J. Neubarth, M.D., and supporting exhibits.

11       Regarding the event at issue in this lawsuit, B. Johnson declares the following:

> I was assigned to Building Three (3A03), which was an administrative segregation housing unit of Facility 3A on March 22, 2006.  Exhibit 60 is a copy of the FLSA report dated February 13, 2006 through March 22, 2006.  This report reflects that I was assigned to post 311238 on March 22, 2006, which was an assignment to 3A03 as a floor officer.
>
> I was not assigned to Building Four (3A04) on March 22, 2006.
>
> I did not escort any inmates to 3A04 on March 22, 2006.
>
> At approximately 1930 hours on March 22, 2006, I was leaving the Facility 3A Program Office and observed correctional officers J. Gonzales and D. Valtierra escort an inmate, who I later learned to be Plaintiff Jawwaad Hasan, to 3A04.
>
> I provided additional coverage during the escort to 3A04.
>
> I observed Officers Valtierra and Gonzales escort Hasan to a holding cell in 3A04.
>
> During the escort, I observed Officers Valtierra and Gonzales counsel Hasan in the 3A04 building rotunda entrance area concerning the administrative segregation program.
>
> I never spoke to Hasan during the escort.
>
> I did not come into physical contact with Hasan.
>
> I did not observe any correctional officer use force against Hasan.

>I did not observe any correctional officer lift Hasan up by his handcuffs and then throw Hasan against the rotunda walls for several minutes while handcuffed.
>
>I never had malicious intent to harm Hasan during the escort.

(Johnson Decl. ¶¶ 3-14.)[3]

Although C/O Johnson declares that he did not escort any inmates to 3A04 on the date at issue and that he observed C/O Valtierra and C/O Gonzales escort Plaintiff, Plaintiff's testimony in his deposition creates a triable issue of fact as to whether Johnson escorted Plaintiff. Plaintiff states that:

>Once they got all the paperwork together, Gonzalez, Villateri and B. Johnson showed up in ad seg and they said turn around. And I turned around to face Johnson – no, Johnson stood up as the primary escort person. He stood up and he had his handcuffs in his hand and he said turn around.
>
>And so I turned around in the cage and I put my hands behind my back and put it close to where he could reach into the little slot right there to handcuff me. Once I was handcuffed he unlocked it. As soon as he unlocked it he slammed me – he slammed my head into the cage. I said, "What are you doing ?" He said, "Shut up." And then he said, "Back out." And then – can I get up and demonstrate?
>
>Q: Yeah, Please.
>
>A: So he started backing me out like this, and as I backed out, he kept raising me up like this, causing me like this. So I'm like this coming out, coming out of the cage. And so he has me like this, and then he's directing me out through the door of the program office,  So at this time Johnson is behind me and got me jacked up like this. And Villateri and Gonzalez is on the side of me like this, and I'm being escorted. . . .
>
>I'm walking like this. I'm telling him you're hurting my arm. I got a brace on this arm, and he's got it twisted up and it's painful. I'm telling him you're going to break my arm. He said, "Shut up you piece of shit." And I'm going like this all the way to ad seg.
>
>Q: Okay. For the record, Mr. Hasan was demonstrating how he

---

[3] In his declaration, Defendant Johnson refers to Correctional Officers Valtierra and Gonzales. In the deposition, Plaintiff refers to Correctional Officers Valliteri and Gonzalez. The Court presumes these to be the same individuals, as both documents refer to the two officers as the escort officers.

was escorted, hand behind the back, lifted towards the sky on his tippy toes.

How far was it from the program office to the ad seg building?

A: Distant wise, I would say about 50 feet, about 50 to 75 feet, I believe.

Q: All right. And did you have to go outside during the escort?

A: Yeah. You go outside and you – there's a walkway. There's two ways to get there. They took the walkway, the main walkway area to the main fence, and then you unlock the fence, and I went through the fence. We pass 5 Building, and then we went through 4 Building that is next to 5 Building. 4 Building is right there, and I went in through the rotunda of 4 Building.

Q: And so you were placed in 3A-4?

A: Yeah. Yeah, but when we was in the rotunda – as soon as we were in the rotunda, that's when B. Johnson slammed me against the wall. See, now all the way to the rotunda I'm still walking jacked up like this. So once we got into the rotunda, he slammed me against the wall and my head hit the wall and my shoulder hit the wall with a nice little good impact, and he got in my ear and said, "You piece of shit, don't you ever threaten staff, one of my officers again."

After he said that, he started – he had me by the arm and he was just slamming me. The rotunda is about this wide. And so once I was in the rotunda, he slammed me against the wall like this and then he turned me around and slammed me against the other wall and he kept slamming me back and forth against the wall. So when I'm getting slammed against the wall, my head and my shoulder is hitting the wall like this, and so I'm trying to manage my weight because now I don't want my head – the head to keep hitting the wall. So I'm trying to switch my shoulder to take the impact. So I'm fighting with him. And so when I hit the wall, now this is hitting the wall. My shoulder is hitting the wall. So I've got to manage my weight and make sure my shoulder hit the wall instead of my head. So that it is what was taking place.

Q: And were Villateri and Gonzalez still with you at that time?

A: Yes, they was there. They didn't intervene at all. They sat there and watched B. Johnson assault me.

(Pltf.'s Dep. 48:12-49:2, 49:21-52:1).

Defendant's own evidence creates a triable issue of fact as to whether he was present and

7

whether he escorted Plaintiff and subjected him to excessive force.  Defendant's declaration establishes that he observed C/O Gonzales and C/O Valtierra escort Plaintiff.  Plaintiff's deposition, submitted by Defendant, establishes that Johnson was present, handcuffed Plaintiff, escorted Plaintiff and slammed him into the rotunda wall.  A triable issue of fact exists as to whether Johnson was present and subject Plaintiff to excessive force.

Defendant argues that where objective evidence in the record clearly contradicts the opposing party's version of the story such that no reasonable jury could believe it, "a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380-81(2007)(motorists's version of events so utterly discredited by videotape that no reasonable jury could have believed him).  In that case, in analyzing a qualified immunity claim in the context of a Fourth Amendment excessive force claim, the Supreme Court did note that when one version of events "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id.

Regarding Johnson's declaration, the Court notes that Johnson's statement that he was not there and Plaintiff's testimony that he was is clearly a question of credibility - the sort of question reserved for a finder of fact.  In Scott, the videotape evidence so clearly contradicted the plaintiff's testimony that there could be no doubt that the plaintiff's version of events was untrue.  Here, there is no clearly objective evidence that contradicts Plaintiff's testimony that Johnson was present and escorted Plaintiff.  As will be discussed below, evidence of injury is a factor in determining whether excessive force was used, and is not dispositive of the question.  Here, the question is a simple question of credibility.

Defendant also argues that the medical evidence in this case constitutes the objective evidence that so clearly contradicts Plaintiff's statements as to render them not credible. Defendant submits the declaration of K. Koehler, LVN, who declares that:

1. I examined Plaintiff Jawwaad Hasan twice on March 22, 2006.

2. My first examination of Hasan occurred as part of Hasan's designation for placement in administrative segregation.

3. When inmates are designated for placement in administrative segregation, they are routinely visually evaluated for injuries or unusual occurrences.

4. A record of the examination is documented on a CDC 7219 "Medical Report of Injury or Unusual Occurrence." This examination record includes notations for abrasions/scratches, active bleeding, broken bone, bruise/discoloration, burn, dislocation, dried blood, fresh tattoo, cut/laceration/scratch, O.C. spray area, pain, protrusion, puncture, reddened area, skin flap, swollen area, or "other" injuries.

5. In completing the form, the examiner indicates on a pictoral diagram of the human body where any of the injuries occurred. The examiner also documents the patient's subjective observations about his medical condition. Every injury is documented on the 7219 form. Even the absence of injuries is noted on the 7219 form.

6. The time of the evaluation is noted on the form.

7. In the afternoon of March 22, 2006, Hasan was located in the Facility 3A Program Office temporary holding cell.

8. I visually examined Hasan in Facility 3A at approximately 7:30 p.m. A copy of the CDC 7219 form I prepared as part of this examination at approximately 7:30 p.m. is attached as Exhibit 1.

9. I determined that he did not have any injuries or unusual occurrences. I was within three feet of Hasan when I evaluated him.

10. Hasan did not report any injuries to me during the evaluation.

11. I did not notice any injuries to Hasan during my evaluation, including injuries to his left and right wrists, arms, shoulders, injuries to his lower back, sustained cervical or neurological damage, joint separation, "trauma beyond measure," and paralysis.

12. If I had noticed these injuries, I am trained to document them on the 7219 form.

13. The absence of such notations on the CDC 7219 form indicates that I did not observe these injuries.

14. I next evaluated Hasan at approximately 9:15 p.m., in response to an unusual occurrence, and Hasan was present in a holding cell in

> Facility 3A, building 4. A copy of the CDC 7219 form I completed at approximately 9:15 p.m., on March 22, 2006 is attached as Exhibit 2.
>
> During my examination, Hasan stated that he was assaulted by correctional officers, and that officers twisted his arm and hurt him.
>
> I evaluated Hasan and noted that Hasan complained to me that he had pain in his forehead, left shoulder, and left wrist.
>
> I did not notice any injuries to Hasan during my evaluation, including injuries to his left and right wrists, arms. shoulders, injuries to his lower back, sustained cervical or neurological damage, joint separation, "trauma beyond measure," and paralysis.
>
> The absence of such notations on the CDC 7219 form indicates that I did not observe these injuries.
>
> If Hasan had been picked up by his handcuffs and thrown against the rotunda walls for several minutes, he would have likely shown visible injuries.
>
> At approximately 9:30 p.m., I notified the registered nurse on duty to examine Hasan further because of his allegations of injury. I noted this notification on the 7219 form.

(Koehler Decl. ¶¶ 3-22).

The Registered Nurse, Marquez, examined Plaintiff. Aside from his complaints of headache pain, Marquez's examination of Plaintiff did not reveal any injuries to his left and right wrists, arms, shoulders, injuries to his lower back, sustained cervical or neurological damage, joint separation, "trauma beyond measure," or paralysis. (Marquez Decl. ¶ 47.) Based on his knowledge and training as a Registered Nurse, Marquez does not believe that Plaintiff's "superficial redness and headache could have resulted from a correctional officer jerking Hasan's handcuffs, twisting them to the left, and thrusting them upward, causing Hasan to walk on his toes; or an officer slamming Hasan into the rotunda, walls, back-and-forth, for several minutes." (Id., ¶ 50.)

Defendant's Exhibit 12 is a copy of the CDC form 7221, physician's orders, dated March 22, 2006. Exhibit 12 establishes that at 10:30 p.m., Marquez prescribed 600 mg of Motrin, for 3 days for "discomfort, headache, wrists, shoulder." Followup ASH M.D. line on 3/23/06."

10

1    Exhibit 13 is a copy of CDC form 7221, dated March 29, 2006.  Plaintiff was prescribed 600 mg
2    of Ibuprofen as needed for pain for 14 days.
3           The Prison Litigation Reform Act provides that "[n]o Federal civil action may be brought
4    by a prisoner confined in jail, prison, or other correctional facility, for mental and emotional
5    injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. §
6    1997e(e).  The physical injury "need not be significant but must be more than *de minimis*."
7    Oliver v. Keller, 289 F.3d 623, 627 (9th Cir. 2002).
8           However, the relevant inquiry is not whether Plaintiff's injuries are *de miminis*, but
9    whether the use of force was *de minimis*.  See Wilkins v. Gaddy, 130 S.Ct. 1175, 1178
10   (2010)("Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately
11   counts." )  The degree of Plaintiff's injuries only serves as evidence of the degree of force used, it
12   does not conclusively resolve the question of whether the degree of force was *de minimis*.  See
13   Wilkins, 130 S.Ct. at 1178 ("The extent of injury may . . . provide some indication of the amount
14   of force applied.")  Defendant cannot escape liability for the use of force simply because
15   Plaintiff failed to suffer any treatable injury.  See Wilkins, 130 S. Ct. at 1178 ("An inmate who is
16   gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely
17   because he has the good fortune to escape without serious injury."); Hudson, 503 U.S. at 9 ("In
18   the excessive force context, society's expectations are different.  When prison officials
19   maliciously and sadistically use force to cause harm, contemporary standards of decency are
20   always violated.  This is true whether or not significant injury is evident.") (internal citations
21   omitted).  This case therefore turns on whether the force used was excessive within the meaning
22   of the Eighth Amendment, or used in a good faith effort to restore order or maintain discipline.
23   The extent of Plaintiff's injury will be a factor in determining whether the force used by Johnson
24   was excessive.
25          Plaintiff's testimony in his deposition creates a triable issue of fact regarding whether
26   Johnson escorted Plaintiff.  Plaintiff also states in his deposition, regarding his examination, that

he told the nurse that he had a scratch on his head, but it was not marked down.  Plaintiff also indicates that "my head – right where my head hit the wall, I had a bruise and it was tender, but it hadn't swelled all the way up yet when she got there." (Pltf.'s Dep. 57:3-5.)   Plaintiff also states that he told C/O Malloy that "my head is throbbing, my shoulders, I need medical attention." (Id., 59:3.)

      Defendants correctly argue that Plaintiff is not a medical professional and is not qualified or competent to render medical opinions.   Plaintiff's testimony does, however, create a triable issue of fact as to whether he told medical officials that he was injured.  Plaintiff's statement establishes that his head was "throbbing," and his shoulders hurt.  As noted, the evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587.   Taking Plaintiff's statements as true, and drawing the inferences in his favor, a triable issue of fact exists as to whether the force used was excessive and whether Plaintiff suffered head and shoulder pain.

### IV.    Qualified Immunity

      Defendant further argues that he is entitled to qualified immunity from suit.  Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " Saucier v.Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), overruled on other grounds by Pearson v. Callahan,555 U.S.223, 233 (2009)).  In applying the two-part qualified immunity analysis, it must be determined whether, "taken in the light most favorable to [Plaintiff], Defendants' conduct amounted to a constitutional violation, and . . . whether or not the right was clearly established at the time of the violation." McSherry v.City of Long Beach, 560 F.3d 1125, 1129-30 (9th Cir.2009).  These prongs need not be addressed by the Court in any particular order.

1  Pearson, 555 S.Ct. at 233.  "The relevant, dispositive inquiry . . . is whether it would be clear to a
2  reasonable officer that his conduct was unlawful "in the situation he confronted."  Norwood v.
3  Vance, 591 F.3d 1062, 1068 (9th Cir. 2010) .

4     Defendant argues that Plaintiff has provided no more than his lay affidavit to prove that
5  he was seriously injured during an escort on March 22, 2006.  Plaintiff's testimony in his
6  deposition, however, establishes that Defendant escorted him, jerked his handcuffs up and
7  slammed Plaintiff into the rotunda wall.  The deposition also establishes that the use of force was
8  unprovoked.  In determining whether summary judgment is appropriate, we must view the
9  evidence in the light most favorable to the non-moving party.  Huppert v. City of Pittsburg, 574
10 F.3d 696, 701 (9th Cir. 2009).  The Court finds that a correctional officer would reasonably
11 believe that jerking Plaintiff's chain upward during an escort and slamming Plaintiff's head into
12 a wall, despite no physical resistance, violates a clearly established right.  Defendant Johnson is
13 therefore not entitled to qualified immunity.

14    Accordingly, IT IS HEREBY ORDERED that Defendant's motion for summary
15 judgment is denied.

19   IT IS SO ORDERED.

20   **Dated:**  **April 1, 2013**     /s/ **Gary S. Austin**
                       UNITED STATES MAGISTRATE JUDGE